**MARK K. SCHONFELD (MS-2798)**
**REGIONAL DIRECTOR**

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-1020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

-against-

ROBERT DURANT, ROBERT JOHNSON,
LORI CAPORICCI, JAMES BENNETT,
TYDE, INC., and BEARCAT FINANCIAL
SERVICES, INC.,

    Defendants.

---

08 1539

GLEESON, J.

LEVY M.J.

Civil Action No.

**COMPLAINT**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ APR 15 2008 ★
BROOKLYN OFFICE

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against defendants Robert Durant ("Durant"), Robert Johnson ("Johnson"), Lori Caporicci ("Caporicci"), James Bennett ("Bennett"), Tyde, Inc. ("Tyde"), and Bearcat Financial Services, Inc. ("Bearcat") (the "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.     This action involves fraudulent conduct in the securities lending, or "stock loan," business. The Defendants orchestrated a scheme to defraud JP Morgan Chase Bank ("Chase") out of over $1 million in connection with a series of securities lending transactions between Chase and Dresdner Kleinwort Wasserstein Securities LLC ("DKW") that were originally

recorded in April 2003. Durant, a stock loan trader then employed by Chase, schemed with so-called stock loan "finders" Johnson, Caporicci, and Bennett to misappropriate the bulk of Chase's profits on these stock loan transactions. As a result of the Defendants' scheme, DKW paid Bearcat, a stock loan finder firm owned by Bennett, sham finder fees out of the interest payments that DKW owed to Chase. From May 2003 through June 2003, the Defendants caused DKW to pay Bearcat a total of approximately $1.2 million in sham finder fees in connection with the April 2003 loans. Using off-shore and other nominee accounts, defendants Durant, Bennett, Johnson and Caporicci later split the sham finder fees among themselves.

2. Neither Bearcat nor Tyde, the firm through which Johnson and Caporicci conducted their stock loan "finder" business and perpetrated the fraud, performed any finding services at all on these stock loan transactions. Under the terms of the stock loan transactions as originally recorded, all of the money that was eventually paid to the Defendants was supposed to go to Chase, but Durant, pursuant to the scheme, later altered Chase's stock loan records and caused DKW's records to be altered so as to drastically reduce the amount of interest payable to Chase -- from an average of 7.15% down to 0.25% on each of the seven stock loans -- and divert the balance to Bearcat.

3. By virtue of the foregoing conduct, each of the Defendants, directly or indirectly, singly or in concert, violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R § 240.10b-5]; and each of them is also liable in the alternative, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting the violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] committed by those defendants with whom they

schemed. Unless each of the Defendants is permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

## **JURISDICTION AND VENUE**

4. The Commission brings this action pursuant to the authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and seeks to restrain and enjoin the Defendants permanently from engaging in the acts, practices, transactions and courses of business alleged herein. The Commission also seeks a final judgment ordering the Defendants to disgorge their ill-gotten gains and pay prejudgment interest thereon, and ordering the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act, [15 U.S.C. § 78u(d)(3)].

5. This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa]. The Defendants, directly and indirectly, have made use of the means or instrumentalities of, or the means or instruments of transportation or communication in, interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices and courses of business alleged herein. Some of these transactions, acts, practices and courses of business occurred in the Eastern District of New York, where one of the Defendants also resides and where some of the Defendants transact business. For example, the funds misappropriated from Chase in the form of sham finder fees were moved through Staten Island, New York bank accounts in the course of the Defendants' scheme.

## THE DEFENDANTS

6. **Durant**, age 42, resides in Milford, Connecticut. From 1994 through July 2003, Durant was a stock loan trader at Chase. After leaving Chase, Durant worked briefly for a registered broker-dealer but is no longer employed in the securities industry.

7. **Johnson**, age 44, resides in Somers, New York. From March 1999 through October 2004, Johnson purported to perform stock loan finding services through Tyde, which he formed in 1999. Since May 2007, Johnson has been associated with MetLife Securities, Inc., a registered broker-dealer, and he holds series 7 and series 63 licenses.

8. **Caporicci**, age 39, resides in Staten Island, New York. From 2001 through at least July 2003, she purported to perform stock loan finding services through Tyde as an independent contractor. From 1989 through 1999, Caporicci worked as a stock loan trader for several broker-dealers.

9. **Bennett**, age 65, resides in New Port Richey, Florida. From 1993 through April 2004, he purported to perform stock loan finding services through Bearcat, which he formed in 1993.

10. **Tyde** is a New York corporation with a business address in New York, New York. Tyde is owned and controlled by Johnson.

11. **Bearcat** is a Florida corporation with a business address in New Port Richey, Florida. Bearcat is owned and controlled by Bennett.

## RELEVANT ENTITIES

12. **DKW** is registered with the Commission as a broker-dealer and maintains its principal place of business in New York, New York.

4

13.     **Chase** is a banking corporation organized under the laws of the State of New York, and maintains its principal place of business in New York, New York.

## BACKGROUND

### Structure Of Stock Loan Transactions

14.     A securities loan is a collateralized, temporary exchange of securities. The collateral is usually cash or other securities. Under the terms of the standard loan agreements that govern these transactions and as a matter of industry practice, borrowers are free to re-lend, sell or otherwise do as they please with the stock, subject only to satisfying the obligation to return the same number of shares at the end of the loan term. Financial institutions borrow securities for different purposes. For example, a broker-dealer may need to borrow securities to cover short sales or a bank may wish to lend securities to gain short-term access to cash. Here, as detailed below, the stock loans at issue were initially motivated by a borrower's desire to obtain certain financial advantages available to that borrower from holding a particular stock on the date on which the stock issuer paid dividends, and by the lender's desire to earn a profit by lending that stock to such a borrower at that time.

15.     If the security is liquid (*i.e.* readily available and thus called "easy-to-borrow"), the financial institution borrowing the security also receives interest for the duration of the loan on the cash collateral it makes available to the lender. The interest payment is called a "rebate." If the security is in limited supply (*i.e.* "hard-to-borrow"), the borrower generally pays interest to the lender for the right to borrow the security. This interest payment is called a "negative rebate." The rebates and negative rebates are a percentage of the total market value of the securities and are quoted as annual percentage rates. Stock loan transactions may stay open for as little as one trading day or as long as several months or even a year.

### Role And Compensation Of Finders

16. In the past, stock loan traders typically employed the services of finders to locate hard-to-borrow stock. In today's securities market, however, traders rarely need the services of finders. Technological advances and other improvements have made it easier and faster for traders to locate hard-to-borrow securities on their own. On April 29, 2005, the New York Stock Exchange ("NYSE") issued an advisory opinion cautioning all member firms about continuing to do business with finders and stating as follows: "We have seen only limited instances where a finder is actually providing services that an effective stock loan department could not provide."

17. The stock loan finder's fee would typically be negotiated by the lender and borrower as part of the terms of the stock loan and, like the rebate rate, expressed in basis points as a percentage of the total market value of the stock. In order to be paid, finders typically submitted fee invoices to the financial institutions.

18. The rebates and finder fees are calculated and paid on a daily basis, and the brokerage firms and finders continue to receive payments until the borrowed stock is returned or recalled. Accordingly, loans that remain open for extended periods generate substantial profits for both financial institutions and finders.

19. Although some financial institutions permitted the use of and payments to finders during the relevant period, many financial institutions, including Chase, had policies prohibiting its stock loan traders from using or paying finders.

## THE DEFENDANTS' FRAUDULENT SCHEME

### Overview

20. In early 2003, Durant, Johnson, Caporicci and Bennett entered into a scheme to misappropriate, through the payment of sham finder fees, a substantial portion of the large profits

6

to be generated in connection with a series of stock loan transactions between Chase and DKW. Durant developed the scheme with Johnson and Caporicci, whom he had known for several years. Johnson and Caporicci then recruited Bennett to join their scheme, because Bennett's finder firm (Bearcat), unlike Johnson's finder firm (Tyde), had an existing relationship and was authorized to do business with DKW. As detailed below, Durant caused Chase to lend certain Italian securities to DKW, and then falsified, and had others falsify, the relevant trading records to divert to Bearcat, in the form of sham finder fees, approximately $1.2 million -- virtually all of the interest payments due from DKW to Chase. Neither Bearcat nor Tyde, nor any other finder, performed any finding services whatsoever on these loans, and the Defendants divided the sham fees according to an agreed upon formula.

## Genesis And Mechanics Of The Scheme

21. In April 2003, Durant had an opportunity to cause Chase to lend certain Italian securities that would command high negative rebate (*i.e.* interest) payments from the borrower. These securities were in particularly high demand at the time because the issuer was scheduled to pay a dividend later that month to the holder of the securities. Accordingly, Chase did not need the services of a stock loan finder to find a borrower in the marketplace who would agree to pay an attractive interest rate to borrow the securities. However, rather than enter into a loan that would benefit Chase, which prohibited the use of and payments to finders, Durant schemed to loan the securities to a financial institution that paid finders so that he could divert a portion of the interest payments to himself in the form of sham finder fees. Johnson, Caporicci and Bennett participated in the scheme in exchange for a share of the sham finder fees.

22. Pursuant to the scheme, Durant caused Chase to lend the Italian securities to DKW, which used and paid finder firms. Bearcat, Bennett's finder firm, had an existing

7

arrangement with DKW and had obtained finder fees from DKW in the past in connection with other stock loan transactions. Durant and Bennett caused Bearcat to be listed as a finder on the Italian stock loan transactions between DKW and Chase even though neither Bennett nor anyone from Bearcat provided any finder services on those transactions.

23.  Durant and a stock loan trader at DKW initiated and negotiated the terms of the loan transactions without the assistance of Bearcat or any other finder. On April 2, 2003, Durant emailed the DKW stock loan trader a list of Italian securities that Chase was willing to lend to DKW, and the two traders negotiated a total of seven loans from Chase to DKW: four loans of ENI Spa Roma ("ENI") stock and three loans of ENEL-Societa Per Azioni ("ENEL") stock.

24.  The following chart shows the details of each of the seven loans that Chase and DKW originally entered into during April 2003:

| Stock | Trade Date | Number of Shares | Opening Loan Value | Rebate Rate |
|---|---|---|---|---|
| ENI | 4/4/03 | 3,150,000 | $47,880,000 | -8.25% |
| ENI | 4/15/03 | 3,500,000 | $52,850,000 | -6.37% |
| ENI | 4/15/03 | 3,500,000 | $52,625,000 | -6.62% |
| ENI | 4/22/03 | 3,500,000 | $53,375,000 | -7.50% |
| ENEL | 4/4/03 | 350,000 | $2,135,000 | -6.51% |
| ENEL | 4/4/03 | 750,000 | $4,575,000 | -6.51% |
| ENEL | 4/24/03 | 500,000 | $3,125,000 | -7.85% |

The opening loan value is the number of shares multiplied by the market price of the stock, and the negative rebate rate is the rate of interest due from DKW to Chase on the value of each loan.

25.  When first recording these loans, Durant and the DKW trader at DKW correctly entered the foregoing information into the relevant stock loan order tickets, thereby indicating that Chase was to receive the entire rebate payment, and accurately indicated that no finder was involved in the loans. To effectuate the fraudulent scheme, Durant subsequently falsified, and caused the DKW trader to falsify, the relevant stock loan trading records at their respective firms

8

so as to divert to himself and the other defendants the bulk of, or in some cases the entire, rebate payments due to Chase. In an attempt to avoid detection, Durant waited for a period of time after the loans were booked and then altered the stock loan records at Chase for these loans to show that Chase was to receive only a -0.25% rebate payment on each of the loans. Durant then caused the DKW trader to alter DKW's stock loan records to show that: (i) DKW was to pay Chase only a -0.25% rebate on the transactions, and (ii) the balance of the rebate rate was to be paid to Bearcat as a finder fee. In addition to causing most of Chase's profits to be fraudulently paid to Bearcat, Durant knew that the foregoing information would be entered into the stock loan trading systems at both firms and, as a result, the records of both firms would show the same information when the trades were subsequently reviewed by supervisory and compliance personnel.

26. As a result of the falsification of the relevant stock loan trading records -- and contrary to the terms of the loans as originally negotiated -- DKW was to make payments to Chase and Bearcat according to the following terms:

| Stock | Total Rebate | Lender Rebate to Chase | Rebate Diverted to Bearcat |
|---|---|---|---|
| ENI | -8.25% | -0.25% | -8.00% |
| ENI | -6.37% | -0.25% | -6.12% |
| ENI | -6.62% | -0.25% | -6.37% |
| ENI | -7.50% | -0.25% | -7.25% |
| ENEL | -6.51% | -0.25% | -6.51% |
| ENEL | -6.51% | -0.25% | -6.51% |
| ENEL | -7.85% | -0.25% | -7.60% |

27. Five of the seven stock loan transactions remained open after April 2003 and resulted in sham finder fee payments to Bearcat pursuant to the Defendants' scheme and in accordance with the falsified stock loan records. To obtain the payments, Bennett submitted false invoices to DKW on behalf of Bearcat. These invoices were false because they sought

9

payment of "stock loan fees" for services that were never performed. Bennett submitted three such invoices before the scheme unraveled, on the following dates: May 29, 2003, June 16, 2003, and July 16, 2003. DKW paid the May and June invoices, in the amounts of $376,934 and $817,020, respectively, for a total of $1,193,953. As a result of the Defendants' scheme, DKW was deceived into making these payments to Bearcat based on the false belief that Bearcat performed finder services in connection with the ENI and ENEL stock loan transactions with Chase. As a result of the Defendants' scheme, Chase was defrauded out of $1,193,953 in interest payments that it would have otherwise received for loaning these securities to DKW.

28. The scheme unraveled before DKW paid Bearcat's July 16, 2003 invoice for $709,631. Supervisors at Chase had begun to question the comparatively low -0.25% rebate being paid to Chase on these transactions and conveyed Chase's concerns to a senior stock loan supervisor at DKW. Further inquiries ensued and the discrepancies in the records for these loans were eventually discovered. DKW then undertook a broader investigation into the transactions and ultimately refused to pay Bearcat's July 2003 invoice. When questioned by supervisors at Chase, Durant at first falsely claimed that the low rebate rate was a mistake, but he ultimately resigned in July 2003.

## Distribution Of The Proceeds Of The Fraud

29. Bennett and Bearcat distributed the $1,193,953 in sham finder fees as follows: Bennett kept $119,395, or approximately 10% of the total, for himself and paid Johnson $268,639, or approximately 25% of the remaining balance, most of which Bennett paid to Johnson by writing two checks to Tyde from Bearcat's account. Bennett then wired the balance to a Staten Island bank account held by a company controlled by Caporicci's boyfriend. Caporicci had the funds wired from that account to an off-shore bank in St. Marten, Netherlands

Antilles, where Caporicci and Durant had accounts. Caporicci received $268,639, or approximately 25% of the balance remaining after Bennett took his cut, and Durant received $537,279, or approximately 50% of that balance.

30. To conceal the fraudulent nature of the payments they received from Bearcat, Johnson and Caporicci created a trail of false invoices. Caporicci sent Bennett two phony invoices for purported "stock loan consultation fees" for the months of April and May 2003, and Johnson sent Bennett at least one phony invoice on behalf of Tyde for supposed "stock loan clearance" fees for May 2003.

## CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5

31. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 30.

32. The Defendants directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in the offer or sale and in connection with the purchase or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

33. As part and in furtherance of the fraudulent scheme and other violative conduct described above, each of the Defendants, directly or indirectly, singly or in concert, employed the deceptive devices, schemes, artifices, contrivances, acts, transactions, practices and courses of business and/or made the misrepresentations and/or omitted to state the facts alleged above in paragraphs 1-2 and 14-30.

34. The false and misleading statements and omissions made by the Defendants, more fully described above in paragraphs 1-2 and 14-30, were material.

35. The Defendants knew, or were reckless in not knowing, that these material misrepresentations and omissions, more fully described above in paragraphs 1-2 and 14-30, were false or misleading, and the Defendants otherwise acted with the requisite scienter by knowingly or recklessly engaging in the fraudulent scheme described above in paragraphs 1-2 and 14-30.

36. By reason of the acts, statements, omissions, practices, and courses of business alleged herein, the Defendants, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

37. By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act, each of the Defendants, singly or in concert, directly or indirectly, also aided and abetted each other's primary violations by knowingly providing substantial assistance to the other defendants' violations of, and unless enjoined will again aid and abet violations of, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently enjoining and restraining each of the Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### II.

Ordering each of the Defendants to disgorge the ill-gotten gains they received from the violations alleged herein, and to pay prejudgment interest thereon.

### III.

Ordering each of the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## IV.

Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
April 15, 2008

/s/ MK

MARK K. SCHONFELD (MS-2798)
REGIONAL DIRECTOR

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-1020

Of Counsel:

David Rosenfeld
George N. Stepaniuk
Joseph Dever
Burk Burnett
Kenneth V. Byrne
Karen M. Lee